Steven A. Santos
1224 S Street
Eureka CA 95501
(503)709-3450
santos@peak.org

Pro Se Plaintiff

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVSION

Steven A. Santos

          Plaintiff

     vs.

County of Humboldt

         Defendant

Case Number: 1:22-cv-07485-RMI

**SECOND AMENDED COMPLAINT**

1.    **Jurisdiction.** This court has jurisdiction over this complaint because it arises under the laws of the United States such as 42 U.S.C. §12203, 42 U.S.C. §2000e-3 and 42 U.S.C. §12112.

2.    **Venue.** Venue is appropriate in this court because both the Plaintiff and Defendant are located in this district, and the acts or omissions giving rise to this lawsuit occurred in this district.

3.    **Intradistrict Assignment.** This lawsuit should be assigned to the Eureka Division of this Court because a substantial part of the events or omissions which give rise to this lawsuit occurred in Humboldt County.

4.    Plaintiff Steven A. Santos is an employee of Humboldt County and has worked for the Planning and Building Department since 2006 and has served as a Senior Planner since July 2017.  Plaintiff has a qualifying disability under the Americans with Disabilities Act (ADA) (¶6).

5.    Defendant County of Humboldt is a public sector employer with significantly more than 15 employees and is subject to the ADA.  The Clerk of the Board of Supervisors is located at 825 Fifth Street, Room 111, Eureka, California 95501.

**Statement of Facts**

*Qualifying Disability:*

6.    Plaintiff has a qualifying disability under the ADA because he has been diagnosed by an appropriate medical professional with chronic migraines.  Per the diagnosis and medical documentation, the medical condition represents a physical impairment that is permanent and when acute interferes with one or more major life activities, including caring for self, concentrating, hearing, interacting with others, learning, reading, seeing, speaking, thinking, and working.

*Migraine Nature, Frequency, and Duration:*

7.    Migraines are more than just a headache and include sensitivity to light, noise, and smell, nausea, vomiting, and profound fatigue. Plaintiff currently experiences migraines approximately two to three times a week.  At its worst, Plaintiff has experienced daily migraines. At best, there have been periods where Plaintiff has experienced migraines only twice a month. Migraine attacks can be moderate where activities are possible under managed conditions or attacks can be acute requiring bed rest.  Migraines have various stages.  The prodrome phase involves the presentation of various physiological symptoms hours or even days before an attack. The aura phase, if present, signals an imminent attack, and occurs approximately 5 to 60 minutes before an attack and an individual experiences sensory disturbance typically in vision, hearing, or touch.  The attack phase is the most painful and disruptive and can include vomiting and can last several hours and sometimes days.  The postdrome phase, sometimes referred to as the migraine hangover, is marked by fatigue and can last up to two days depending on the severity of

the attack. The migraine mechanism is a positive feedback cycle resulting in increased severity and frequency from each episode which is why management and treatment focuses on avoiding triggers and aborting attacks.

***Essential Job Duties:***

7a.     The essential duties of the Senior Planner position include interacting with the public, researching a wide array of policies and land use regulations, and reviewing and generating technical documents such as staff report and conducting public presentations. Performance of these duties is impossible while experiencing an acute migraine.

***Accommodation Effect:***

8.     The private office portion of Plaintiff's accommodation allows Plaintiff to manage and exercise control over his immediate physical work environment, particularly for light, sound, and smell.  This allows Plaintiff to sometimes avoid migraine attacks.  The ability to manage the physical work environment also allows Plaintiff to continue to perform his duties when he is in the prodrome or postdrome phases.  The private office also allows Plaintiff to continue to perform duties during mild and sometimes during moderate attacks. The modified schedule portion of Plaintiff accommodation, as currently adjusted, is work hours of 9:00AM to 5:30PM with flexibility in scheduling a daily 30-minute lunch. Most other employees work 8:00 to 5:00 or 8:30 to 5:00 though some employees without disabilities have modified work schedules.   A daily disciplined routine is essential to chronic migraine management.   The modified start time allows Plaintiff to engage in daily physical therapy and provides time for medication to take effect prior to arriving at a stressful workplace.  The flexible lunch scheduling allows Plaintiff additional options to take appropriate measures if he experiences an aura warning of an imminent migraine attack.

***Accommodation History Summary***:

9.     Plaintiff notified Defendant of his medical condition and need for accommodation with the doctor's note on August 8, 2016.  It is not entirely clear when exactly Plaintiff's accommodations were first granted.  The first written mention of time flexibility appears in an August 9, 2016 email from Plaintiff to Defendant. The first verbal discussion of the need for a

private office accommodation occurred in May 2017. The first written mention of private office space accommodation appears in September 6, 2018 meeting notes taken by Defendant. The accommodations were verbally verified by Defendant in front of a third party witness in a July 18, 2019 meeting and appear in Defendant's meeting notes for that date.  In an April 8, 2021 letter to Plaintiff, the Defendant acknowledges that it had consented to a private office and modified schedule at some point prior to January 2019.  A May 7, 2021 email from Defendant's agent, ShawHR, to Defendant states the private office accommodation has been in place for four years.  Consistent with these data points, it has been Plaintiff's perception that the modified schedule accommodation was granted in August 2016 and the private office accommodation was granted in May 2017.

### *Medical Documentation History Summary:*

10.     On June 23, 2017 Defendant asked Plaintiff to provide a doctor's note describing "diagnosis, prognosis, and restrictions."  On July 24, 2017 Plaintiff provided the requested content.  At that time Plaintiff asked if additional documentation was needed and never received a response.   On September 6, 2018 Defendant requested Plaintiff provide a personal questionnaire and a medical questionnaire.  Plaintiff provided the personal questionnaire on October 4, 2018 and the medical questionnaire on January 18, 2019.  The July 24, 2017 doctor's note was also appended to and resubmitted with the questionnaire in January 2019.  The medical documentation was reviewed in a July 18, 2019 meeting between Plaintiff and Defendant and no additional medical information was requested or identified as needed.

### *Recent Interactive Process:*

11.     At a February 5, 2021, meeting with his supervisor at that time, Plaintiff was told he would be required to perform work in a physical setting other than his office in an environment that was known to aggravate his medical condition.  Specifically, Plaintiff was told that he would have to sit at the front counter even when customers were not present or in need of assistance. Plaintiff did not object to assisting customers as he has successfully accomplished that task as needed in the past by phone, by zoom, and in person.  Plaintiff objected to being subjected to physical stimuli that aggravates his medical condition when there were no customers

and no business necessity. When Plaintiff asserted his accommodation, Plaintiff's supervisor said Plaintiff did not have a disability or an accommodation and would have to go through an interactive process.

12.     On April 9, 2021, Defendant asked Plaintiff to return a medical questionnaire certifying he had a disability and needed accommodation.  Plaintiff objected because sufficient documentation had already been provided and accepted, twice, certifying existence of permanent disability (¶10) and an accommodation already granted (¶9).  Defendant then hired a third-party contractor (agent) to interact with Plaintiff.  On May 20, 2021, Defendant's agent sent Plaintiff a letter stating Plaintiff would be subject to a fitness for duty exam based on the false premise that Plaintiff's current treating and primary care doctor was not qualified. Plaintiff's current primary care doctor is different from the doctor that generated the medical questionnaire in 2019 but is a licensed and qualified medical doctor who carries out the treatment plan of the original treating specialist and both doctors worked in the same practice together. Plaintiff challenged and corrected this false premise in email correspondence on May 25 and May 26, 2021.

13.     On June 14, 2021, Defendant's agent convened a meeting with Plaintiff but denied Plaintiff opportunity to contribute to the design of the agenda.  Plaintiff prepared a document relevant to meeting and provided it to Defendant's agent prior to the meeting but Defendant's agent did not distribute the document to decision makers and intentionally excluded it from the meeting record.  Defendant's agent also altered the medical questionnaire provided by Plaintiff in 2019 by creating a different version of the original resulting in the omission of words and removal of relevant formatting. At the June 2021 meeting, Defendant reversed its prior decision that the medical documentation in the record was sufficient to make accommodation decisions.  This reversal was used to justify, after the fact, the decision in May 2021 that Plaintiff would be subject to a fitness for duty exam. The Defendant's decision was based on their agent's claim that medical documentation for migraines includes numerical thresholds for physical stimuli triggers.  Defendant through its agent posited that, using light for example, that it is ascertainable to determine that at some fixed number of lumens a migraine occurs.  Additionally, the modified schedule portion of Plaintiff accommodation was not identified by Defendant as

being under review during the June 2021 meeting nor does it appear in the meeting summary that date.                                                                                                                            /

14.     Following the June 14, 2021, meeting in emails between Plaintiff and Defendant's Assistant Director of Human Resources, Defendant acknowledged that the medical documentation in the record had been previously deemed sufficient to make accommodation decisions.  Defendant further communicated on July 12, 2021, the likelihood that Defendant would reject anything Defendant may receive from Plaintiff's current doctor and proceed with its own third-party fitness for duty exam.

15.     On July 14, 2021, Plaintiff requested copies of all records that relate to his ADA status.  Defendant did not provide any records.  Plaintiff hired an attorney to request the records and on October 14, 2021, Defendant provided copies of Plaintiff's job applications and performance evaluations instead of providing responsive documents related to the interactive process or accommodation. Plaintiff subsequently made additional requests on November 9, 2021, February 1, 2022, February 14, 2022, and August 29, 2022 for copies of his ADA related records.  Defendant never responded to any of these requests nor provided a reason for why the ADA records were being withheld.

16.     Also on July 14, 2021, Plaintiff made a complaint to Human Resources under Defendant's Equal Employment Opportunity policy.  Defendant never responded to complaint. Plaintiff also made a complaint to the EEOC and informed Defendant of the EEOC complaint.

17.     On July 26, 2021, Defendant replaced the April 9, 2021 medical questionnaire form with a new form. Though characterized as a "supplemental" questionnaire, the form still asked Plaintiff to establish he had a disability.  The form also asked Plaintiff's doctor to migraine triggers such as light and sound in numerical thresholds. Plaintiff objected to questionnaire form and Defendant did not meet with Plaintiff or respond to his objections.  The medical questionnaire and cover later did not mention or identify the modified schedule portion of Plaintiff's accommodation as being within the scope of the 2021 interactive process.  The cover letter and questionnaire only covered the private office accommodation.

///

SECOND AMENDED COMPLAINT                    CASE NO.: 1:22-cv-07485-RMI

18.     On September 1, 2021, Plaintiff informed Defendant that an interview was scheduled with the California Department of Fair Employment and Housing to investigate Plaintiff's complaint.  Defendant continued to fail to meet with Plaintiff to discuss or resolve concerns and objections. Plaintiff participated in an investigatory interview by DFEH on October 28, 2021

19.     On November 2, 2021, Plaintiff received a Notice of Directive from Defendant requiring him to submit to a fitness for duty exam.  The Notice of Directive was based in part on the premise that sitting at the front counter when no customers are present was a business necessity, the insufficient medical documentation had been previously provided, and that Plaintiff's doctor was not qualified.

20.     Also on November 2, 2021, Plaintiff's union representative sent Defendant correspondence challenging the basis of the Notice of Directive. Defendant did not respond to the November 2, 2022, correspondence from Plaintiff's union representative.

21.     On November 9, 2021, Plaintiff wrote a letter to Defendant describing factual errors and omissions in the Notice of Directive.  Plaintiff requested that the fitness for duty be postponed and requested a meeting.  Defendant did not respond to Plaintiff's November 9, 2022, letter.

22.     On November 15, 2021, out of fear of discipline in the form of termination for insubordination, Plaintiff attended the fitness for duty exam.  Defendant's examiner did not ask or discuss the questions that were on the so-called supplemental questionnaire.  Defendant's examiner asked Plaintiff to disclose every aspect of his health and history such as every surgery and medication and vaccination.  These questions intruded into every aspect of private life including reproductive health.  There was no nexus between migraines and many of the examination questions.  Plaintiff proactively discussed his migraines and both the private office and modified schedule accommodation with Defendant's examiner. The examiner concurred with the efficacy of both accommodations. The exam was witnessed by a union representative.

23.     On December 7, 2021, Plaintiff sent a letter alerting Defendant that Defendant's examiner invaded Plaintiff's medical privacy.  Plaintiff requested that he be informed of the

agenda, purpose, and goal in advance of all future ADA related meetings.  Defendant never responded to Plaintiff's December 7, 2021, letter.

24.    On January 26, 2022, Defendant conducted a meeting with Plaintiff and did not disclose the purpose of the meeting in advance despite Plaintiff's December 7, 2021 request (¶23).  Defendant sent an email regarding the topic of the meeting to Plaintiff one hour before the meeting.  The email included attachments including Defendant's version of the examiner's report.  Plaintiff had received the examiner's report seven weeks prior to this meeting but chose to share it only an hour before the meeting.  Plaintiff received the email 30 minutes before the meeting leaving no time to review the materials or prepare in a meaningful way.  Plaintiff attended the meeting remotely from home while sick and notified Defendant of his condition, but Defendant carried out the meeting anyway.

25.    On January 31, 2022 Defendant sent Plaintiff a meeting summary that included a description of Plaintiff's accommodation.  The accommodation description did not include any reference to a modified or flexible schedule.  With the meeting summary, Defendant provided Plaintiff a version of the examiners report created by the Defendant that included redactions and alterations.  Plaintiff made multiple requests to receive copies of the documents sent to the examiner as well as unaltered copies of the original documents given to Defendant by its examiner.  These requests were made on November 9, 2021; February 1, 2022; February 14, 2022; and August 29, 2022.  Defendant did not provide copies of these documents to Plaintiff or respond to Plaintiff's requests to explain why the documents were being withheld.

26.    Plaintiff filed a grievance relating to the ADA process in November 2021.  Step 4 of the grievance process requires there be a meeting between employee and employer and this meeting was not conducted by Defendant. Plaintiff reminded Defendant of the incomplete ADA grievance process in August 2022 and Defendant did not complete the grievance process.

27.    On March 22, 2022 Defendant issued a reprimand to Plaintiff for incompetence, willful disobedience and neglect of duty for allegedly failing to follow an instruction to post projects in a tracking software system.  Plaintiff filed a grievance on April 4, 2022.  In accordance with Step 4 of the merit system rules, Defendant was supposed to meet with Plaintiff

regarding the grievance before rendering a decision on the grievance but failed to conduct the meeting.  Defendant response to the grievance should have described the outcome of the meeting that did not occur.  Instead, Defendant's response to Plaintiff grievance expanded the scope of the allegations to include poor performance during the previous year which happened to also coincide with the interactive process that occurred in 2021.  Plaintiff brought the grievance to a Merit System Appeals Panel on June 9, 2022.  The Appeals Panel sustained Plaintiff's grievance that the original reprimand and Defendant's subsequent grievance response containing additional allegations were arbitrary and capricious, defamatory, and unsubstantiated.  The Appeals Panel directed Defendant to remove the reprimand and grievance response from Plaintiff's personnel file.  Defendant has yet to comply with the Merit System Appeals Panel and continues to maintain a copy of the reprimand and grievance response in Plaintiff's personnel records. Evidence of this was provided to Plaintiff when Defendant sent the reprimand and grievance response to the Plaintiff on February 3, 2023 as part of his personnel records as part of the initial disclosures under General Order 71.

28. Having not heard from Defendant for six months, on August 29, 2022 Plaintiff sent Defendant correspondence regarding the January 2022 accommodation summary mentioning that the modified schedule accommodation (¶9) was missing.  Plaintiff met with Defendant on September 13, 2022, to give Defendant the opportunity to correct the accommodation summary to include the modified schedule.  However, Defendant discouraged Plaintiff from further discussing the modified schedule as an accommodation stating that would be the "hard way." Rather, Defendant suggested that Plaintiff submit annual requests to his Department Director, which is a discretionary decision, outside of the ADA.  Defendant further told Plaintiff he would be subjected to another medical exam if he attempted to defend his modified schedule accommodation even though Plaintiff discussed his modified schedule with Defendant's examiner in November of 2021 (¶22).

29. Plaintiff continues to experience constant fear and anxiety that his accommodation and ability to work will be taken away arbitrarily at any time.  This fear and anxiety include being subjected to additional capricious and invasive medical inquiry or other

arbitrary employment actions if he attempts to defend or exercise his rights in the future.  This fear and anxiety resulted in and continues to cause stress that exacerbates Plaintiff's medical condition which caused and continues to cause significant physical pain, sleep loss, emotional distress, trauma, missed work, and disruption to life activities.  Plaintiff informed Defendant on several occasions that Defendant's conduct was causing pain and suffering, but Defendant never responded to or discussed these concerns with Plaintiff, and Defendant intensified the negative treatment as the interactive process went on.  Plaintiff attempted multiple options to mediate and resolve his concerns, but Defendant failed to participate or follow its own grievance procedures (¶26 and 27).

30.    On August 31, 2022, Plaintiff received a right to sue letter from the Civil Rights Department, State of California that is dual filed with state case number 202108-14374305 and EEOC number 37A-2022-00346-C.

31.    On October 3, 2022, Plaintiff received a determination and notice of rights letter (dated September 29, 2022) from the US Equal Employment Opportunity Commission verifying he has the right file a lawsuit under federal law within 90 days of receiving the determination and notice letter.  The original complaint was timely filed within 90 days.

32.    **Claims:** 1) Defendant failed to provide a reasonable accommodation per 42 U.S.C. §12112; 2) Defendant committed retaliation per 42 U.S.C. §12203 and 42 U.S.C. §2000e-3; and 3) Defendant interfered with Plaintiff's exercise of rights under the ADA per 42 U.S.C. §12203.

**Claim #1 Failure to Provide Reasonable Accommodation**

33.    The ADA treats the failure to provide a reasonable accommodation as an act of discrimination if the employee is a "qualified individual," the employer receives adequate notice, and a reasonable accommodation is available that would not place an undue hardship on the operation of the employer's business. Per 42 U.S.C. § 12112(b)(5)(A) ("[T]he term `discriminate against a qualified individual on the basis of disability' includes — not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate

that the accommodation would impose an undue hardship on the operation of the business of such covered entity[.]"). See Snapp v. United Transp. Union, 889 F.3d 1088, 1095 (9th Cir. 2018).

34.   In this instance, the failure to provide a reasonable accommodation took the form of failing to continue to provide an established accommodation in the form of a modified schedule. The existence of a modified schedule accommodation for Plaintiff's is mentioned in April 9, 2021 correspondence from Defendant as well as July 18, 2019 interactive meeting notes (¶9).  The modified schedule portion of Plaintiff's accommodation was absent from the January 31, 2022 accommodation summary sent to Plaintiff by Defendant (¶25).  The modified schedule was not identified as being part of the 2021 interactive process and review (¶13 and 17). Plaintiff gave Defendant opportunity to clarify whether the January 31, 2022 accommodation summary was exclusively an update to Plaintiff's private office accommodation and did not effect the modified schedule accommodation.   In a September 13, 2022 meeting Defendant stated that a modified schedule was not part of his current accommodation (¶28).   When Defendant arbitrarily took away Plaintiff's flexible schedule accommodation in the January 2022 accommodation summary, it failed to continue to provide a reasonable accommodation.  (Isbell v. John Crane, Inc., 30 F.Supp.3d 725 (2014) and Rivera v. Altranais Home Care LLC, 2022 WL 16158).  Defendant has not provided any documentation to Plaintiff demonstrating that the modified schedule represented an undue burden.  Defendant had provided a modified schedule accommodation to Plaintiff for several years and Defendant provides modified schedules to other employees without disabilities.

### *Adequate Notice:*

35.   Plaintiff first gave notice to Defendant of his medical condition on August 8, 2016 with a doctor's note and the need for a scheduling accommodation on August 9, 2016 (¶9). Plaintiff provided an additional doctor's note on July 24, 2017 and a complete and detailed medical questionnaire on January 18, 2019 (¶10).  Plaintiff's disability status was discussed at multiple interactive meetings.

///

*Qualified Individual:*

36.     Plaintiff has been employed by Defendant since 2006 and has served in the Senior Planner classification since July 2017 (¶4).   Plaintiff meets the experience and education requirements described in the Senior Planner position description.   Defendant recognized Plaintiff as qualified for the position when Defendant reclassified him from a Development Assistance Manager to a Senior Planner in July 2017.

*Reasonable Accommodation Available:*

37.   The availability of a modified schedule as a reasonable accommodation is demonstrated by the fact that Defendant had previously granted a modified schedule to Plaintiff. A modified schedule appears in September 6, 2018 interactive meeting notes taken by Defendant.  A flex schedule is also described as an accommodation in July 18, 2019 interactive meeting notes taken by Defendant.   A modified schedule also appears in April 8, 2021 correspondence from Defendant (¶9).  Defendant also provides modified schedules to employees without disabilities.

**Claim #2 Retaliation**

38.     42 U.S.C. 12203(a) states: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. §2000e-3 states: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

///

SECOND AMENDED COMPLAINT          CASE NO.: 1:22-cv-07485-RMI

*Protected Activities:*

39.     Plaintiff engaged in the following protected activities: 1) Plaintiff asked for an accommodation (¶9);  2) After being told he would be relocated on February 5, 2021, Plaintiff asked that his private office accommodation be respected(¶11); 3) Plaintiff made complaint under county Equal Employment Opportunity policy on July 14, 2021 (¶16); 4) Plaintiff made complaint to EEOC on July 14, 2021 (¶16); 5) Plaintiff participated in an investigatory interview by DFEH on October 28, 2021 (¶18); 6) Plaintiff expressed opposition regarding content of medical questionnaire (¶17); and 7) Plaintiff attempted to gather evidence by requesting records on multiple occasions (¶15 and 25); and 8) Plaintiff filed grievances (¶26 and 27)

*Adverse Employment Action Standard*

40.     The EEOC has interpreted "adverse employment action" to mean "any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity." Although EEOC Guidelines are not binding on the courts, they constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.  In Ray v. Henderson, 217 F.3d 1234 (2000), the Ninth Circuit provides an overview of how different Circuit courts have determined what constitutes an adverse employment action. Anti-retaliation provisions in 42 U.S.C. 12203(a) and 42 U.S.C. 2000e-3(a) do not limit what type of discrimination is covered, nor do they prescribe a minimum level of severity for actionable discrimination.  In Ray v. Henderson, the court held "Because the EEOC standard is consistent with our prior case law and effectuates the language and purpose of Title VII, we adopt it, and hold that an action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity. Adverse employment actions are defined broadly and not limited to such actions as discharges, transfers, or demotions. See Lyons v. England, 307 F.3d 1092, 1118 (9th Cir. 2002). Absent a universal test, the question of adverse employment action is considered broadly and conducted on a case by case basis.

///

///

*Adverse Employment Action – Reprimand*

41.   On March 22, 2022 Defendant disciplined Plaintiff by issuing a written reprimand for incompetence, willful disobedience and neglect of duty for allegedly failing to follow an instruction to post projects in a tracking software system. The reprimand included language warning Plaintiff of "further disciplinary action." Plaintiff filed a grievance for the reprimand consistent with Defendant's Merit System Rules. Step 4 of the grievance process under the Merit System Rules required Defendant to meet with Plaintiff but Defendant did not conduct the required meeting. Instead, Defendant responded to Plaintiff's grievance by expanding the time frame and allegations associated with the reprimand disciplinary action. The expanded time frame included the time period in 2021 in which Plaintiff was engaged in protected activities. The expanded scope of the employment action included allegations that Plaintiff exhibited poor performance. The expanded time frame and scope of allegations in the grievance response could be construed as a separate adverse employment action. Plaintiff brought the grievance to a Merit System Appeals Panel on June 9, 2021 for both the original reprimand and the Defendant's grievance response. The Panel sustained Plaintiff's grievance that the reprimand and subsequent allegations in Defendant's grievance response were arbitrary and capricious, defamatory, and unsubstantiated. The Appeals Panel directed Defendant to remove the reprimand and grievance response from Plaintiff's personnel file(s). Defendant has yet to comply with the Merit System Appeals Panel and continues to maintain a copy of the reprimand and grievance response in Plaintiff's personnel records (¶27). The reprimand, the grievance response expanding the time frame and allegations, and the failure to implement the decision of the appeals panel represent an adverse employment action.

*Adverse Employment Action – Involuntary Medical Exam*

42.   On November 2, 2021, Plaintiff received a Notice of Directive from Defendant requiring him to submit to a fitness for duty exam (¶19). The Notice of Directive was an employment action because Plaintiff was subject to discipline if he did not comply. While a fitness for duty exam can be part and parcel of an interactive process, it is also possible for a medical exam to become an adverse action by an employer. The scenario of a retaliatory

medical exam has been contemplated by the EEOC, providing the following guidance, "If an individual provides sufficient documentation to show the existence of an ADA disability and the need for reasonable accommodation, continued efforts by the employer to require that the individual see the employer's health professional could be considered retaliation." (Enforcement Guidance on Reasonable Accommodation and Undue Hardship under the ADA October 17, 2002, EEOC-CVG-2003-1, at Note 33.)   The EEOC provides additional guidance regarding when medical documentation is sufficient: "Documentation is sufficient if it: (1) describes the nature, severity, and duration of the employee's impairment, the activity or activities that the impairment limits, and the extent to which the impairment limits the employee's ability to perform the activity or activities; and, (2) substantiates why the requested reasonable accommodation is needed." (Enforcement Guidance on Disability-Related Inquiries and Medical Examinations of Employees under the ADA July 26, 200, EEOC-CVG-2000-4, at 10.)   As discussed in ¶40, while not binding on the courts, it is not improper for litigants to look to the EEOC for guidance.

43.   42 U.S.C. § 12112, subd. (d)(4)(A) states: "A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity" [underline added].   The medical exam was an outcome of a February 5, 2021 meeting with Plaintiff during which he objected to being relocated from his private office to the front counter when customers were not present or in need of assistance (¶11).  Having employees present at the front counter when there are no customers does not constitute a business necessity. Defendant currently does not require employees that work in the same wing of the building as Plaintiff to sit at the front counter when customers are not present further demonstrating that the proposed relocation of Plaintiff was not business necessity. Subjecting an employee to a medical exam that does not comply with 42 U.S.C. § 12112, subd. (d)(4)(A) could be considered adverse due to the intrinsic involuntary and invasive nature of the exam.  A medical exam that does not comply with 42 U.S.C. § 12112 could also be considered adverse under more restrictive tests for

adverse employment action such as altering the "terms and conditions" of employment because the premise for the exam did not include business necessity.

44.     One purpose of the medical exam as expressed by Defendant's July 2021 medical questionnaire was to determine whether Plaintiff had a disability (¶17).  However, as described in ¶6 and 10, Plaintiff had already documented, twice, through a qualified medical professional that he has a permanent disability.  Revisiting the question of permanent disability through an involuntary medical exam with a doctor of the employer's choosing could legitimately be construed as adverse because it enables an employer to arbitrarily reject authentic medical documentation and engage in forum shopping until a result more favorable to the employer is obtained.  While Defendant's examiner reaffirmed Plaintiff's permanent disability for a third time, the revisiting of the question through the involuntary exam could still be considered adverse because of the pervasive level of uncertainty it creates regarding the ongoing reliability of the resulting accommodation. Construing the revisiting of the question of permanent disability through the medical exam as retaliatory because that question had already sufficiently been answered is consistent with the EEOC test described in ¶42.

45.     It is understood that when an employee puts their medical condition at issue in a lawsuit or other matter, that an inquiry into their medical condition is not a violation of privacy. See EEOC v. The Cheesecake Factory, Inc., No. C16-1942JLR, 2017 U.S. Dist. LEXIS 144391. However, careful review of the Cheesecake Factory decision indicates that the scope of that medical inquiry must be disability related.  This interpretation is consistent with the plain language of 42 U.S.C. § 12112, subd. (d)(4)(A). The court in Cheesecake Factory did not require Mr. Ivanov to produce all of his medical records, but rather only those medical records that "relate to either Mr. Ivanov's hearing impairment or any other condition that constitutes a disability from January 1, 2010, to the present."  Therefore, it is reasonably inferred that a medical inquiry under the ADA is not unlimited.  In the present case, Defendant required a medical exam of Plaintiff supposedly to identify numerical light, sound, and smell restrictions associated with Plaintiff's Migraines issuing a "supplemental" questionnaire structured around migraine physical stimuli (¶13 and 17).  However, Defendant's examiner asked Plaintiff to

disclose every aspect of his health and medical history including every diagnosis, surgery and medication and vaccination Plaintiff had ever received or taken.  These questions intruded into every aspect of Plaintiff's life including reproductive health.  There was no nexus between migraines and many of the examination questions.  Defendant never identified that it suspected Plaintiff may have another disability other than chronic migraines or any other job-related medical concern that needed exploration during the medical exam.  Defendant through its examiner also made recommendations regarding what medications should be taken for migraines.  These recommendations conflicted with Plaintiff's treatment plan.  An employer is not authorized by the ADA to tell an employee what medications he should be taking for his medical condition. It was appropriate for Defendant's examiner to discuss Plaintiff's migraines and associated treatments, history, and medications but it was inappropriate and invasive for Defendant's examiner to embark on a limitless exploration of Plaintiff's medical profile.  The exploration by Defendant's examiner into Plaintiff's non-disability related medical information made the examination adverse due to the psychological and emotional trauma it caused.  The intrusion into Plaintiff's personal life beyond his job duties and disability presents a significant deterrence from engaging in protected activities.

### *Causal Link Considerations*

46.     Absent a documented express declaration of intent to retaliate, it is appropriate to consider various circumstantial factors to establish retaliatory animus.  These factors can include temporal proximity of events, whether adverse employment actions were taken for legitimate reasons, and whether an employer engaged in other conduct that could be considered bad faith or suspicious.

### *Temporal Proximity - Reprimand*

47.     The March 22, 2022 reprimand was temporally proximate to the 2021 interactive process.  Defendant had issued an accommodation summary on January 31, 2022 and Plaintiff continued to attempt to gather evidence requesting records on February 14, 2022.  The April 29, 2022 grievance response was proximate to the April 6, 2022 grievance.  The grievance response

alleging poor performance described a time period that coincided with the time period in 2021 during which Plaintiff had engaged in numerous protected activities (¶39).

### Reprimand Not Legitimate

48.    On June 9, 2022 an independent Merit System Appeal Panel determined that the reprimand and grievance response including additional allegations were not legitimate (¶27).

### Reprimand Other Factors

49.    The fact that Defendant did not meet with Plaintiff as required by Step 4 of the grievance process in the Merit System Rules and continues to maintain the reprimand and grievance response in Plaintiff's personnel records despite the ruling of the Appeal Panel are also suggestive of retaliatory animus.

### Temporal Proximity – Involuntary Medical Exam

50.    The Notice of Directive for the fitness for duty exam occurred five days after Plaintiff was interviewed by the Department of Fair Employment and Housing (DFEH) (¶18 and 19).  The Directive came approximately two months after making complaints and making the first of several investigatory requests (¶15 and 16).  There also exists suspicious timing in Defendant not providing the medical questionnaire to its examiner until after the examination of Plaintiff was conducted.

### Involuntary Medical Exam Other Factors

51.    The decision to subject Plaintiff to a fitness for duty exam was made by Defendant in May of 2021 (¶12).  This decision occurred before the June 14, 2021 meeting with Plaintiff that discussed medical documentation (¶13).  This timing suggests Defendant was seeking a reason to justify a decision already made for other than legitimate purposes.  Defendant through its agent suppressed a document prepared by Plaintiff for the June 14, 2021 and altered the previously provided medical documentation (¶13).  The interactive process is supposed to be collaborative, and the effect of suppressing and altering information prior to a meeting in which a decision was made is suspicious and disadvantaged Plaintiff.  Defendant through its agent claimed medical documentation for migraines includes numerical thresholds for migraine physical stimuli (¶13) however Defendant's medical examiner, which was selected by

Defendant's agent and does exams for Defendant's agent on a regular basis, does not provide numerical thresholds in his report. This suggests the medical exam decision at the June 2021 was based on false pretenses which can be construed as retaliatory intent. In a May 7, 2021 email to Defendant from its agent ShawHR, Defendant's agent informs Defendant that it has the option to conduct an interactive process meeting and develop a long-term accommodation plan that includes the private office without a fitness for duty exam. Additional context in this email suggests that the sole purpose of the fitness for duty exam was to see if Defendant could obtain alternate rather than supplemental medical documentation to justify taking away the private office accommodation. Considering the facts described in this paragraph, it can be reasonably interpreted that the decision in May 2021 for a fitness for duty exam, which was proximate to Plaintiff defending his existing private office accommodation, was an intentional attempt to take away the very accommodation Plaintiff was defending. This intent can be construed as retaliatory animus. Following the June 14, 2021 interactive meeting Defendant's Assistant Director stated in emails with the Plaintiff that the medical documentation provided in January 2019 was sufficient to make accommodation decisions (¶14). Defendant further expressed Defendant's intent to reject any additional documentation from Plaintiff's doctor to justify a fitness for duty exam. The admission that the medical documentation in the record was sufficient and the pre-judgment of any future potential medical documentation from Plaintiff's doctor can be construed as retaliatory animus because it suggest the fitness for duty exam was not for legitimate purposes.

### *Causal Link Other Conduct*

52.     The January 26, 2022 interactive meeting was conducted even after Plaintiff informed Defendant he was sick at home. Defendant was in possession of the medical examiner's report for seven weeks but did not send it to Plaintiff until one hour before the meeting. Defendant created an altered version of the examiner's report. Defendant did not inform Plaintiff of the purpose of the meeting until one hour before even though Plaintiff had made a written request for advanced notice (¶23 and 24). Not providing advance notice, not allowing a participant to prepare, altering a report, and conducting a meeting while someone is

sick at home are not consistent with a good faith interactive process. This behavior suggests intention to disadvantage Plaintiff and can be reasonably construed as part of a larger mosaic of retaliatory animus.

53.     Plaintiff made numerous requests for access to his ADA records held by Defendant (¶15 and 25). Plaintiff never provided responsive records nor provided a reason for the withholding. Plaintiff has recently received records from DFEH discovering that there are additional documents in the form of correspondence between Defendant and Defendant's agent ShawHR that Defendant did not provide to Plaintiff as part of the initial disclosures under General Order 71. This document production request also revealed that Defendant provided an unaltered version of the medical examiner's report to DFEH but would not provide a copy to Plaintiff. The chronic behavior of withholding records for which Plaintiff is entitled suggests intention to disadvantage or frustrate Plaintiff and can be reasonably construed as part of a larger mosaic of retaliatory animus.

54.     Defendant ignored substantive correspondences from Plaintiff and Plaintiff's union representative (¶20, 21 and 23) and ignored Plaintiff's complaint under county EEO policy ¶16). Defendant also ignored multiple requests by Plaintiff to meet and discuss legitimate questions and concerns. This behavior is not consistent with a good faith interactive process and can be reasonably construed as part of a larger mosaic of retaliatory animus.

55.     Starting in May 2017, after Defendant was aware of Plaintiff's disability and need for a private office accommodation, Defendant has told Plaintiff on five additional separate occasions that he is going to be moved out of his private office. This included being told management was "determined to move you out of your space." This also included announcing Plaintiff's was going to be moved out of his office to co-workers so Plaintiff's colleagues would approach him to ask about it. Being told that you are going to be moved so many times while either going through an interactive process or having accommodation is not consistent with the protected status a person with a disability is entitled to enjoy. Involving co-workers is not justifiable. This behavior can be reasonably construed as part of a larger mosaic of retaliatory animus.

56.     If there were merely a handful of the events described in ¶47 through 55 perhaps they could be explained as isolated mistakes, oversight, or incompetence.  However, the totality of all of these decisions and behaviors provides a convincing mosaic of circumstantial evidence.

**Claim #3 Interference with Exercise of Rights Under the ADA**

57.     42 U.S.C. §12203(b) states "It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this Act."

*Threats and Intimidation*

58.     On August 18, 2018 Plaintiff's Department Director tells Plaintiff he has no disability.  On March 12, 2019 Plaintiff's Director tells Plaintiff he has no disability.  On February 5, 2021 Plaintiff's then Supervisor tells Plaintiff he has no disability.  Defendant repeatedly telling someone with a documented disability that it doesn't exist is an act of intimidation.

59.     As described in ¶55, since May 2017, which was the first time Plaintiff was told he would be moved out of his private office, Defendant has told Plaintiff five additional times that he is going to be moved out of his office. This includes announcing it to Plaintiff's coworkers instead of directly to Plaintiff.  Being told so many times that the accommodation was going to be taken away and involving co-workers is an act of intimidation. Ever since establishing his disability and accommodation, Defendant has on a regular basis threatened to take it away.

60.     On December 17, 2018 Plaintiff's Department Director demanded Plaintiff provide him a copy of Plaintiff's medical documentation.   If Plaintiff did not comply, Defendant's Department Director stated that Plaintiff was going to be moved out of his office. Plaintiff informed Defendant that the medical documentation obtained two weeks prior was still under review by Plaintiff's representatives and that Plaintiff had been instructed to give the medical documentation to Human Resources and not the Director.  In an email on the same date, Plaintiff explained to Defendant that being told his accommodation will be taken away is the

same as being told his job is going to be taken away and complying with the demand was the only way to "halt the move." Plaintiff complied with the demand and provided the medical questionnaire to Defendant's Director out of fear the threat would be carried out even though the documentation was still being reviewed by others and wasn't ready to provide to Defendant.

61.     As described in ¶28 Plaintiff met with Defendant on September 13, 2022, to give Defendant the opportunity to correct the accommodation summary to include the modified schedule. However, Defendant discouraged Plaintiff from further discussing the modified schedule as an accommodation stating that that would be the "hard way." Rather, Defendant suggested that Plaintiff submit annual requests to his Department Director, which is a discretionary decision, outside of the ADA. Defendant further told Plaintiff he would be subjected to another medical exam if he attempted to defend his modified schedule accommodation even though Plaintiff discussed his modified schedule with Defendant's examiner in November of 2021 (¶22). Defendant had actual knowledge of Plaintiff negative experience with the previous medical exam when it suggested another exam which made the reference intimidating and coercive to the Plaintiff.

### *Palpable Injury*

62.     A palpable injury could consist of either the giving up of ADA rights, or some other injury which resulted from refusal to give up rights, or from the threat itself. See Brown, 336 F.3d at 1193.

63.     The adverse employment actions of the reprimand and grievance response described in ¶41 as well as the involuntary medical exam described in ¶42 can be construed as palpable injuries. Being forced to provide draft medical documentation under threat (¶60) can be construed as a palpable injury.

64.     As described in ¶29, Plaintiff continues to experience constant fear and anxiety that his accommodation and ability to work will be taken away arbitrarily at any time. This fear and anxiety include being subjected to additional capricious and invasive medical inquiry or adverse employment actions if he attempts to defend or exercise his rights in the future. This fear and anxiety resulted in and continues to cause stress that exacerbates Plaintiff's medical

condition which caused and continues to cause significant physical pain, sleep loss, emotional distress, trauma, missed work, and disruption to life activities.  This pain and suffering can be considered as "some other injury" resulting from the threats and intimidation from Defendant as Plaintiff refuses to give up his rights under the ADA.

65.    **Request for Relief.** 1) Equitable relief in the form of restoration of 160 hours of sick leave; Restoration of the flexible schedule portion of Plaintiff's accommodation; and removal of the March 2021 reprimand and April 2021 Grievance response from all employment files maintained by Defendant; 2) $150,000 in non-economic pain and suffering damages are sought for the failure to accommodate claim.  3) $1,650 in economic damages for actual direct costs incurred through February 2022 associated with the interactive process.  4) Reimbursement of court fees and other reasonable costs associated with this lawsuit.

66.    Plaintiff is not requesting a jury trial.

Date: March  24, 2023.          Sign Name: _Steven A. Santos_
                               Print Name: Steven A. Santos