Steven A. Santos
1224 S Street
Eureka CA 95501
(503)709-3450
santos@peak.org

Pro Se Plaintiff

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

EUREKA DIVSION

| | |
|---|---|
| Steven A. Santos<br>Plaintiff<br>vs.<br>County of Humboldt<br>Defendant | Case Number: 1:22-cv-07485-RMI<br>**OPPOSITION TO MOTION TO DISMISS**<br>Date: June 20, 2023<br>Time: 11:00 a.m.<br>Judge: Honorable Robert M. Allman |

**FACTUAL SUMMARY**

Plaintiff has worked for Defendant since 2006 and is currently employed by Defendant County of Humboldt as a Senior Planner in the Planning and Building Department (SAC ¶4 and 5). Plaintiff has been diagnosed with chronic migraines and notified Defendant of his medical condition and need for accommodations in 2016 and was granted a private office and modified schedule accommodations (SAC ¶6, 8 and 9). Plaintiff has provided sufficient medical documentation which Defendant had accepted establishing he has a permanent disability and the nature and severity of his limitations (SAC ¶10 and 14).

///

In February of 2021 Plaintiff was told he would be required to work in a physical environment that was not a business necessity that was inconsistent with his disability and accommodation. When Plaintiff defended his accommodation, he was told he had no disability and Defendant asked him to re-certify his permanent disability. When Plaintiff pointed out the medical documentation had already been provided and accepted, Defendant decided to subject Plaintiff to a fitness for duty exam (SAC ¶11 and 12). Defendant struggled to find justification for its decision for a fitness for duty exam, ultimately deciding that numerical thresholds for migraine triggers was attainable (SAC ¶13) – a notion that was rejected by Defendant's examiner. (SAC ¶51).

In June 2021 Plaintiff requested his ADA records and Defendant refused. Plaintiff made a complaint under county policy and Defendant ignored it. Plaintiff complained to the EEOC (SAC ¶15 and 16). In late July 2021, Defendant provided Plaintiff with a so-called supplemental medical questionnaire that still included questions to re-certify Plaintiff's permanent disability. Plaintiff objected to the supplemental medical questionnaire (SAC ¶17).

On September 1, 2021, Plaintiff advised Defendant that he was scheduled for an interview with the California Department of Fair Employment and Housing ("DFEH"). Plaintiff participated in an investigatory interview by the DFEH on October 28, 2021 (SAC ¶18). On November 2, 2021 Defendant issued a Notice of Directive to Plaintiff. Plaintiff and Plaintiff's union representative corresponded with Defendant about concerns that the authority and factual basis of the Notice was deficient, but Defendant didn't respond. Plaintiff attended medical exam out of fear of discipline. (SAC ¶19, 20, 21, and 22).

In November 2021, Plaintiff filed a grievance regarding the interactive process and Defendant failed to follow grievance procedures and complete the process (SAC ¶26). On December 7, 2021 Plaintiff sent Defendant a letter describing how the medical exam went beyond a business and disability related inquiry invading Plaintiff's privacy and Defendant did not respond (SAC ¶23).

On January 26, 2022 Defendant conducted a meeting with Plaintiff without giving Plaintiff adequate time to prepare and while Plaintiff was home sick (SAC ¶24). On January 31,

2022 Defendant sent Plaintiff an accommodation summary that did not include the flexible schedule accommodation. Seeking clarity because the flexible schedule wasn't the subject of the 2021 interactive process, Plaintiff met with Defendant on September 13, 2022 and was told he did not have a flexible schedule accommodation (SAC ¶25 and 28).

On March 22, 2022 Defendant issued a reprimand for which Plaintiff filed a grievance. In response to the grievance Defendant expanded the reprimand to include events and the time period associated with the 2021 interactive process. An independent appeals panel sustained the grievance that the expanded reprimand was arbitrary and capricious, defamatory, and unsubstantiated. Defendant continues to maintain copies of the expanded grievance in its files (SAC ¶27).

Plaintiff's claim #1 is that Defendant failed to continue to provide the reasonable accommodation of a flexible schedule without notice or process (SAC ¶33 through 37). Plaintiff's claim #2 is that Defendant committed retaliation when it issued the expanded reprimand and continued to maintain it after the appeals panel ruled against Defendant. Defendant also committed retaliation when it subjected Plaintiff to an involuntary medical exam that was not within the scope of Defendant's authority to demand because medical documentation in the record was sufficient and there was no associated business necessity. The medical exam itself exceeded the scope of a disability and business-related inquiry and invaded Plaintiff's privacy (SAC ¶38 through 56). Plaintiff's claim #3 is that Defendant engaged in threats and intimidation resulting in a palpable injury (SAC ¶57 through 64).

## ARGUMENT

### A. CLAIM #1 FAILURE TO CONTINUE TO ACCOMMODATE

The heart of this claim is the modified schedule portion of Plaintiff's accommodation (SAC ¶8 and 9), a January 31, 2022 accommodation summary (SAC ¶25), and a meeting between Defendant and Plaintiff on September 13, 2022 (SAC ¶28).

***Response to MTD Claim #1 Denial of Accommodation:***

The crux of Defendant's MTD argument for Claim #1 is the supposition that SAC ¶8 demonstrates Plaintiff's flexible schedule accommodation was not removed. The language used

in SAC ¶8 was intended to describe what the terms of the accommodation were at the time it was taken away. Following the September 13, 2022 meeting with Defendant, Plaintiff faces a daily Sophie's Choice of whether to engage in activities that manage his medical condition safely or face the consequence of working inconsistently with an official schedule. Defendant's MTD appears to conflate the tense of the phrasing used in SAC ¶8 as Plaintiff having *approval* of an accommodation or schedule modification. This interpretation is inconsistent with SAC ¶25 and SAC ¶28 which describe the flexible schedule as missing from the January 31, 2022 accommodation summary and a September 13, 2022 meeting where Defendant explicitly said Plaintiff did not have a flexible schedule accommodation. This messaging is a reversal of the documented history of Plaintiff having a modified schedule accommodation since August 2016 which was memorialized in various meeting notes over the years as well as correspondence from Defendant on April 9, 2021 (SAC ¶9). If Defendant, though its Human Resources Department, wishes to take the opportunity to clarify clearly and explicitly that indeed Plaintiff has a flexible schedule accommodation at this time, such a written statement by Defendant would be most welcomed by the Plaintiff.

***Response to MTD Claim #1 Undue Burden:***

Defendant's argument here focuses exclusively on the private office portion of the Plaintiff's accommodation. The failure to continue to accommodate claim SAC ¶34 concerns the flexible schedule portion of Plaintiff's accommodation, not the private office portion so Defendant's argument is perplexing and seemingly off topic. Equally strange is the MTD assigns job duties to Plaintiff that are inconsistent with Defendant's business practices. Specifically, Defendant's MTD states that interactions with the public by Senior Planners include greeting customers and making sure the front counter is not empty. This is not true. Technicians and administrative support staff greet customers and assess their needs. If a technical question needing a land use planner is presented, that is when a Planner gets involved. Planners do not handle building permits or building code questions or handle payment transactions. Planners are not the front-line greeters and customer triage staff as described in the MTD. When Planners are in the lobby they sit with their back to the door behind a partition. If the Planner's personal

workspace is in the same wing as the lobby like Plaintiff's, they remain in their offices if no customers are present (SAC ¶43) therefore there is and was no business necessity when Plaintiff was told he would have to sit at the front counter when customers were not present. None of the arguments in the MTD regarding undue burden is relevant to the unreasonable discontinuation of the modified schedule portion of Plaintiff's accommodation. Regarding the actual claim at hand, the SAC pleads sufficient facts regarding the availability of a reasonable accommodation in the form of a flexible schedule and how it does not represent an undue burden (SAC ¶37). Defendant provided a flexible schedule accommodation to Plaintiff for five years and provides modified schedules to other employees without disabilities. These facts demonstrate availability and lack of undue burden. Defendant has never articulated how a modified schedule represents a significant difficulty or expense nor do such specifics appear in the MTD.

***MTD Claim #1 Summary:***

It is reasonable for Plaintiff to interpret the absence of the flexible schedule from the January 31, 2022 accommodation summary in tandem with the explicit statements made by Defendant at a September 13, 2022 meeting as the unreasonable discontinuation of his modified schedule accommodation. The MTD fails to discuss the modified schedule accommodation in its arguments regarding accommodation availability and undue burden. Plaintiff's prima facie burden is met. Plaintiff provided adequate notice (SAC ¶35). Plaintiff is a qualified individual (SAC ¶36). A reasonable accommodation was available SAC ¶37). Defendant's motion to dismiss claim #1 should be denied. If the phrasing of SAC ¶8 is causing unintended confusion, Plaintiff requests limited leave to amend that paragraph consistent with the clarification described in this Opposition.

**B. CLAIM #2 RETALIATION**

***Adverse Actions Standard:***

In discussing what constitutes an adverse employment action, Defendant summarizes. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006). Defendant's MTD on page 13 states: "In order to meet the standard, Plaintiff has to demonstrate that the action would have been materially adverse to a reasonable employee. Burlington N. & Santa Fe Ry. Co., 548 U.S.

at 57. The challenged action must "resul[t] in an adverse effect on the 'terms, conditions, or benefits' of employment." Id. at 60" [underlined added]. This latter underlined sentence does not appear to be an accurate reading of *Burlington*. At pincite 60 as cited by Defendant's MTD, the Supreme Court in *Burlington* is merely summarizing what standard the Sixth Circuit previously used during its review. However, at pincite 71, the Supreme Court states "Our holding today makes clear that the jury was not required to find that the challenged actions were related to the terms or conditions of employment." Additionally, pincite 57 the Supreme Court summarizes its holding: "We conclude that the antiretaliation provision does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace. We also conclude that the provision covers those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant. In the present context that means that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." Therefore, based on this review of *Burlington,* it is Plaintiff's understanding that terms, conditions, or benefits of employment are not the appropriate standard for adverse actions.

***Adverse Actions:***

The SAC describes two adverse actions: 1) An expanded reprimand that includes a subsequent grievance response SAC ¶41; and 2) An involuntary medical exam SAC ¶42.

***Response to MTD Claim #2 Reprimand Was Expunged:***

Defendant's MTD argues that the reprimand was not sufficiently final because it was modified during a grievance process. The reprimand was modified but not to correct unfounded allegation but by expanding it to include additional unfounded and defamatory allegations SAC ¶41. The MTD further argues that the expanded reprimand was expunged and therefore has no lasting effect. It would seem here the question hinges on the definition of expunged. Plaintiff's understanding of the definition of expunged is to destroy, obliterate, or strike out records or information in files, computers, and other depositories. Defendant's MTD theorizes that removing documents from one set of files and placing them in another set of files qualifies as expungement. The manner in which the records in question were presented to Plaintiff under

General Order 71 are presumed to be a true representation of the manner in which they are kept in Defendant's files. The expanded reprimand did not display any watermarks, stamps, or reference that the expanded reprimand had been "expunged" nor did it include any context or reference whatsoever that they were subject to an appeals panel ruling. Part of the apparent logic to Defendant's argument is that the expanded reprimand was draft in nature (not final). If these documents are draft and not final then there is no legitimate reason to keep them. Defendant seems to further argue that even though the expanded reprimand is about Plaintiff and concerns employment actions they are not part of his overall "personnel" files because they are now in a file with some different and unknown label. This is a purported distinction without a discernable difference. It is unknown who has access to these permanent secret personnel files and what situations they are produced, copied, or distributed. The continued maintenance of these prejudicial and defamatory documents represents a lasting effect. This lasting effect qualifies as "reasonably likely to deter the charging party or others from engaging in protected activity." The documents in question should be expunged properly and removed from all files and destroyed.

***Response to MTD Claim #2 Fitness for Duty Exam Didn't Constitute a Material Change to Plaintiff's Job:***

As described earlier in this Opposition, the *Burlington* decision did not confine actions and harms to those that are related to employment or occur at the workplace. The question is whether the actions were harmful to the point that they could well dissuade a reasonable worker from making or support a charge of discrimination or engaging in other protected activities.

Defendant's MTD claims that Plaintiff refused to provide requested medical documentation citing SAC ¶12. However, this portion of the SAC states "Plaintiff objected because sufficient documentation had already been provided and accepted, twice, certifying existence of permanent disability (¶10) and an accommodation already granted (¶9)." Objecting is not refusal and is also a protected activity. Plaintiff's objection was because sufficient medical documentation had already been provided and accepted as sufficient.

As discussed in SAC ¶42, the EEOC has published guidance that a third party medical exam can be considered retaliatory if sufficient medical documentation has already been

provided by an employee. Defendant does not have unlimited authority to subject an employee to a medical exam. Defendant had previously accepted the medical documentation provided by Plaintiff as sufficient (SAC ¶10 and 14). In this case, Defendant already knew Plaintiff had a disability as well as the nature and severity of the disability (SAC ¶10). As noted in the MTD, the fitness for duty exam must also be consistent business necessity. There was no business necessity (SAC ¶11 and 43). The MTD in response to Claim #1 (but not Claim #2) purports that Plaintiff sitting up at the front counter when no customers are in need of assistance is a necessity, so the counter is not empty if customers arrive. This has already been refuted in the Claim #1 portion of this Opposition because other job positions/classifications are assigned the task of greeting and triaging customers as they enter the lobby. As described in SAC ¶45 "Defendant's examiner asked Plaintiff to disclose every aspect of his health and medical history including every diagnosis, surgery and medication and vaccination Plaintiff had ever received or taken. These questions intruded into every aspect of Plaintiff's life including reproductive health." The exam went way beyond a business and disability related inquiry. Because the requirements for a fitness for duty exam were not met, Defendant did not have authority to order employee to submit to the exam. Because sufficient documentation had been previously provided and the third-party exam invaded privacy beyond what is permitted, the fitness for duty exam was reasonably likely to deter a charging party or others from engaging in protected activity.

***MTD Claim #2 Adverse Action Argument Fails:***

Defendant's MTD regarding adverse actions is based on the argument that the expanded reprimand and involuntary medical exam did not materially affect the terms and conditions of Plaintiff's employment. This portion of Defendant's argument fails because this is not a required finding per *Burlington N. & Santa Fe Ry. Co.,* 548 U.S. at 57 and 71.

***Response to MTD Claim #2 Causal Connection:***

SAC ¶39 describes eight protected activities. The first activity listed in ¶39 is the original request for an accommodation made in 2016 (SAC ¶9). This was listed for reference purposes because without its existence, Plaintiff what have not engaged in the other listed protected activities. Claim #2 for retaliation is based on protected activities by Plaintiff between

February 5, 2021 and February 14, 2022, the time period for which the other seven listed protected activities occurred. This clarification is supported by Plaintiff not describing protected activities that occurred between August 2016 and February 5, 2021. Defendant hammers on the inclusion of this originating act in 2016 as a reason there is no temporal proximity by creating a time dilation of five years. The protected activities and adverse actions relevant to Claim #2 took place over the course of fourteen months. Adverse actions with retaliatory animus can occur in response to string of closely connected protected activities that occurred continuously over a period of time. An adverse action can be in response to a single protected activity or a series of activities.

In its discussion of the expanded reprimand, the MTD conflates the verb "coincided" with the noun "coincidence." The expanded reprimand coincided with the time frame of the 2021 interactive process and was not a mere coincidence. The expanded reprimand included narrative that stated that Plaintiff was not engaged in any other activity that competed with his project assignments. When Plaintiff pointed out that participating in the interactive process was one example of activities that were competing for time during the period in question, Plaintiff was told that his participation in the interactive process was supposed to occur on his personal time. The fact that all other county employees were allowed to participate in the interactive process on county time, but Plaintiff was expected to participate on personal time creates a direct nexus between the interactive process and associated protected activities and the adverse action of the expanded reprimand. Once the original reprimand was challenged, instead of responding on the merits of grievance for the original reprimand, an intentional decision was made to expand the allegations and reprimand. The MTD also says the March 2022 reprimand has no temporal proximity because some of the protected activities occurred eight months prior. The protected activities at issue are part of a connected series of actions regarding Defendant's conduct during the interactive process. The expanded reprimand was retaliation for Plaintiff's activities between February 5, 2021 and February 14, 2022. The expanded reprimand was issued in March of 2022 just a few weeks after the last of the series of connected protected activities.

///

In its discussion of the fitness for duty exam, the MTD confirms Plaintiff allegation that Defendant made its decision to conduct a fitness for duty exam in May of 2021. This was after Plaintiff defended his private office accommodation on February 5, 2021 (SAC ¶11) and after Plaintiff objected to Defendant's April 9, 2021 request that Plaintiff certify his *permanent* disability for a third time (SAC ¶12). Additionally, the original justification for the fitness for duty exam in May 2021 was Defendant's claim that Plaintiff's doctor was not qualified. After realizing that wasn't going to work, Defendant shifted its rationale for justifying the fitness for duty exam by staging a meeting in June 2021 with the outcome that the medical documentation that was previously deemed sufficient was suddenly not sufficient. This reversal in June 2021 was used to justify, after the fact, the decision that was made in May 2021 (SAC ¶13.) The June 2021 medical sufficiency determination was based on the premise that numerical thresholds for environmental triggers for migraines were ascertainable. This premise was objected to by Plaintiff and ultimately rejected by Defendant's own examiner (SAC ¶51). Evaluation of temporal proximity can include a sequence of events. Defendant decided on the fitness for duty exam, shifted its explanation as Defendant sought to construct a justification, and continued to threaten the fitness for duty exam following Plaintiff defending his accommodation in February 2021 and objecting to the April 2021 questionnaire. Defendant altered the April 2021 medical questionnaire to include unascertainable questions after Plaintiff complained, and finally the coup de grâce was the actual Notice of Directive forcing Plaintiff into an invasive involuntary exam, which followed Plaintiff's investigatory interview. The MTD accuses Plaintiff of cherry-picking facts when it is the MTD that is cherry picking the facts by ignoring the sequence of connected events.

***Response to MTD Claim #2 Reprimand and Fitness for Duty Exam Legitimate:***

The MTD appears to argue both sides of the reprimand. Earlier in the MTD, Defendant argues that the Reprimand was never finalized and therefore was not adverse because a Merit System Appeals Panel sustained Plaintiff's grievance that the expanded reprimand was arbitrary and capricious, defamatory, and unsubstantiated. But Defendant's MTD later states that the expanded reprimand was based on a legitimate business basis. The reprimand was not

legitimate, and an independent review panel agreed with Plaintiff, based in part because Plaintiff proved with Defendant's own data that Plaintiff had entered project information into the tracking system by the deadline as instructed.

The MTD goes on to argue that the fitness for duty exam was simply part and parcel of the interactive process. If that was the case, why did Defendant need to shift its reasoning for justifying the exam? What did Defendant's own examiner reject the so-called supplemental questions? Why did Defendant send its examiner the questionnaire *after* the exam? The MTD states any other interpretation of the purpose of the fitness for duty exam is "pure fiction." What isn't fictional is the May 7, 2021 email from Defendant's agent to Human Resources that Plaintiff obtained through a records request from DFEH because Defendant failed to provide it to Plaintiff. In this email, Defendant is informed by its agent that it can create a long-term accommodation plan <u>without</u> a fitness for duty exam (SAC ¶51). This email goes on to advise Defendant that if it does carry out a fitness for duty exam "…there is still a chance that the third party examiner may say that the current accommodations are what he recommends as well." Plaintiff had previously provided medical documentation that satisfies the EEOC test for sufficiency (SAC ¶42 and 44). The May 7, 2021 email shows Defendant's purpose for a fitness for duty exam was to create its own version of medical documentation that was more favorable to Defendant. This is not a legitimate use of the fitness for duty exam process and is an act of retaliation for Plaintiff defending his accommodation.

***Response to MTD Claim #2 Causal Link from Other Conduct:***

The SAC ¶52 through 56 describes Defendant's conduct during the interactive process. The MTD asserts that Defendant acted reasonably and in accordance with the good faith values of the interactive process. When trying to answer whether Defendant conducted the fitness for duty exam or issued the expanded reprimand with retaliatory intent, it is relevant to examine Defendant's conduct during the interactive process. There was no legitimate reason for Defendant to withhold records to which Plaintiff was entitled. There was no legitimate reason for Defendant to suppress documents prepared by Plaintiff from decision makers or meeting summaries. There was no legitimate reason for Defendant to alter the form and format of

medical documentation. There was no legitimate reason to hold a meeting while Plaintiff was sick at home. There was no legitimate reason to not allow Plaintiff time to review materials and prepare for meetings. There was no legitimate reason for Defendant to ignore and fail to respond to multiple substantive correspondences from Plaintiff and Plaintiff's union representative. This consistent pattern of antagonism by Defendant toward Plaintiff was throughout the interactive process. This pattern of behavior is consistent with Plaintiff's assertion that the adverse actions described in the SAC were done with retaliatory intent.

**C. CLAIM #3 INTERFERENCE**

The MTD states that SAC ¶58 provides no context when Defendant intimidated Plaintiff on three separate occasions by telling him he had no disability though one had been documented. The SAC provides the specific dates in which these acts of intimidation occurred. All of these occurrences are after Plaintiff had documented his disability and was granted accommodations (SAC ¶8 and 9). In one instance, the intimidation occurred in a conversation immediately following Plaintiff defending his accommodation (SAC ¶11). The MTD theorizes these statements were advisory to let the Plaintiff know more documentation is needed. If Defendant's intent was to communicate that more documentation was needed, it would have followed its practice of sending Plaintiff a letter from the Human Resources Department stating more documentation is needed and describing what was requested. There were no pending document requests from Human Resources when these statements by Defendant were made. It is an act of intimidation to tell an employee with a disability that he doesn't have one after a qualified doctor has certified it as such and that certification is in an Employer's possession and the Employer has accepted it as valid.

The MTD states that SAC ¶59 does not adequately describe the space to which Defendant threatened to move Plaintiff. The SAC states …" moved *out* of his *private* office" [emphasis added] and further adds that it represented "…the accommodation was going to be taken away." Defendant was threatening to put Plaintiff in a shared space where he could not manage environmental triggers. A reasonable person can understand that SAC ¶59 is describing a move

///

to a space that is incompatible with Plaintiff's medical condition. A photo of the shared space can be provided.

The MTD states that the actions described in SAC ¶60 was a routine request for medical documentation. This is not true. Plaintiff had obtained the medical documentation requested by Human Resources. The documentation was under review by Plaintiff's representative. Plaintiff's Department Director (not human resources) demanded the medical documentation immediately while it was still in draft form and under review under the immediate threat of losing his accommodation.

The MTD does not challenge Plaintiff allegation in SAC ¶61 that Defendant actively discouraged Plaintiff from defending his modified schedule accommodation.

**D. ECONOMIC DAMAGES**

Defendant's MTD correctly identifies the source of the $1,650 in direct costs requested in relief (SAC ¶65). Plaintiff paid $1,650 in fees to consult with two local attorneys in late 2021 and early 2022 respectively regarding Plaintiff's rights. These consultations would not have been necessary but for Defendant's misconduct. The interactive process shouldn't be conducted in a way that requires employees to pay attorneys for assistance. Not being able to recover these types of costs when there is misconduct can have a disenfranchising effect on individuals with limited resources. Plaintiff perceives these costs as an economic injury. This is why they were requested in the relief. If these costs are, as Defendant asserts, improper as economic damages and improper in any form, then Plaintiff does not oppose the court removing them from the complaint.

**CONCLUSION**

For the foregoing reasons, Defendant's motion to dismiss should be denied. Alternatively, if there are minor defects that can be cured by the clarifications presented in this Opposition, then Plaintiff prays for limited leave to make specific amendments consistent with the information and clarifications presented in this Opposition.

Date: May 22, 2023.

Sign Name: [signature]
Print Name: Steven A. Santos